UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Injah Tafari #89A4807,

                Plaintiff,

**Hon. Hugh B. Scott**

07CV0693

                v.

**Decision
&
Order**

Daniel Weinstock, et al.

                Defendants.

Before the Court are the following motions: the plaintiff's motion for injunctive relief (Docket No. 45), the defendants' motion for summary judgment (Docket No. 57) and the plaintiff's motion for reconsideration (Docket No. 73).[1]

**Background**

The plaintiff, Ras-Injah Tafari ("Tafari"), commenced this action alleging a variety of claims against 28 defendants. (Docket No. 1). District Judge Charles J. Siragusa dismissed all of

---

[1] The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. §636(c). (Docket No. 74).

the claims, with the exception of the plaintiff's claim asserting deliberate indifference with respect to his medical care against five defendants: Dr. Daniel Weinstock ("Weinstock"), Marchall Trabout ("Trabout"), Deborah French ("French"), Jean Yost ("Yost") and John Jastrzab ("Jastrzab"). (Docket No. 5). With respect to his medical treatment claims, the plaintiff asserts that the defendants failed to continue certain treatments he was receiving when he transferred from the Eastern Correctional Facility ("Eastern") to the Five Points Correctional Facility ("Five Points"). The plaintiff claims that the defendants failed to provide him with the following: (1) "a therapeutic diet (vegetarian meals);" (2) a large elastic back brace and double mattresses; (3) a hard brace for his left thumb; (4) Goretex boots with top and bottom thermal underwear; (5) daily showers, cotton mattresses and a jock strap; (5) flexeril for back pain; (6) tramadol fro shoulder and thumb pain; (7) Head & Shoulders shampoo and various vitamins. (Docket No. 1 at ¶¶ 14-16). Tafari asserts that on May 23, 2006, Jastrzab told him that the medical items he was bringing in with him from Eastern were not allowed in the SHU at Five Points. (Docket No. 1 at ¶ 22) . Tafari asserts that he met with Dr. Weinstock on May 23, 2006, and that Dr. Weinstock discontinued the above referenced items. (Docket No. 1 at ¶ 24). The plaintiff states that Dr. Weinstock advised him that Dr. Weinstock did not believe that Tafari needed "these treatments any longer now that [he] was in Five Points. I will order you a different pain medication to help with your pain." (Docket No. 1 at ¶ 26). Tafari asserts that he filed complaints relating to the denial of these items, and that on October 12, 2006, Trabout denied his complaint. The plaintiff alleges the skin problems in his groin, the arthritis in his thumb, and his back pain worsened because of the denial of these items. (Docket No. 1 at ¶¶ 30-34). With respect to defendant French, the plaintiff asserts that on October 23, 2006, French measured Tafari's feet to be a size

2

10½, when he, in fact, wears only a size 8½ or 9 in shoes and sneakers, but 9½ in boots. (Docket No. 1 at ¶ 35). Tafari claims that he was forced to wear sneakers which were too long, and too tight due to French's alleged "lie" about his foot size. (Docket No. 1 at ¶¶ 35-37). The plaintiff also asserts that Dr. Weinstock failed to promptly arrange for Tafari to have surgery on his shoulder relating to a broken surgical screw. (Docket No. 1 at ¶¶ 43-46).

The defendants assert that summary judgment is warranted as to each of the defendants. The plaintiff has responded to the motion by providing voluminous medical records going back more than 20 years.[2]

**Motion for Summary Judgment**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. See Trans Port, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party. See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit

---

[2] One exhibit, which the plaintiff identifies as Exhibit J1 - J2,286 – docketed separately as Docket No. 78 – is more than two thousand pages of unnumbered and unindexed medical records from various correctional facilities over several years (but not in chronological order). The vast majority of these documents are not related to the claims in this case. Inasmuch as the plaintiff has not cited to any particular record among these 2000-plus pages as relating to any of the specific claims in this case, the documents in this exhibit are of limited value to the Court.

Information, Co., 970 F.2d 1110, 1112 (2d Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The non-moving party must come forward with enough evidence to support a jury verdict . . . and the . . . motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, 964 F.2d at 188 (citing Bryant v. Maffucci, 923 F.2d at 982). If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the non-moving party." Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992) (citing Dusanenko v. Maloney, 726 F.2d 82 (2d Cir. 1984). The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them. See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir. 1990). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2d Cir. 2000) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**Eighth Amendment Claims**

The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend. VIII. "This includes punishments that 'involve the unnecessary and wanton infliction of pain.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). See also Hernandez v. Keane, 341 F.3d 137, 144 (2d. Cir. 2003). While "society does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian, 503 U.S. 1, 9 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising out of medical care by showing that a prison official acted with "deliberate indifference" to the inmate's serious medical needs. Hathaway v. Coughlin, ("Hathaway I"), 37 F.3d 63, 66 (2d Cir.1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

This standard incorporates both objective and subjective elements. The objective "medical need" element measures the severity of the alleged deprivation, while the subjective "deliberate indifference" element ensures that the defendant prison official acted with a sufficiently culpable state of mind. Smith v. Carpenter, 316 F.3d 178, 183 -184 (2d. Cir. 2003). To prevail on a constitutional claim of deliberate medical indifference, a plaintiff must prove that he suffered from an objectively serious medical condition, which the defendants knew of and deliberately disregarded. Green v. Senkowski, 2004 WL 1292786, *1 (2nd Cir. 2004) citing Chance, 143 F.3d at 702 (collecting cases). A serious medical condition is one that may result in death, degeneration, or "chronic and substantial pain." Id.; see Hathaway I, 37 F.3d at 66. This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain." Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious medical need arises where "the failure to treat a prisoner's condition could result in further

5

significant injury or the unnecessary and wanton infliction of pain." Chance, 143 F.3d at 702. To satisfy the subjective prong of the test, prison officials must have acted with a sufficiently culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment. See Estelle, 429 U.S. at 104-05. See also Farmer v. Brennan, 511 U.S. 825, 837 (1994)("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' Hathaway II, 99 F.3d at 553 (quoting Farmer, 511 U.S. at 835). Accordingly, subjective recklessness can satisfy the deliberate indifference standard only where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. However, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

    Also, it is well-established that a prisoner is not entitled to receive the medical treatment of his choice. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment or a different doctor does not give rise to an Eighth Amendment violation. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986) (The essential test is one of medical necessity and not one simply of desirability). A difference of opinion between a prisoner-patient and

6

prison medical authorities regarding treatment does not give rise to a § 1983 claim. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998); Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.1981). The Constitution does not require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997), Davis v. Hall, 992 F.2d 151, 153 (8th Cir.1993).

Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. Chance v.Armstrong, 143 F.3d. 698 (2d. Cir. 1998); Johnson v. Snow, 2008 WL 2224949 (N.D.N.Y., 2008); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [a court] will not second guess the doctors." (citations omitted)).

Finally, it is well settled that a plaintiff asserting an Eighth Amendment claim based upon inadequate medical care must establish deliberate indifference for each individual defendant against whom the claim is asserted. Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)(stating that plaintiff must show deliberate indifference on the part of a "particular defendant").

**Dr. Weinstock**

Dr. Weinstock is the physician who treated Tafari at Five Points during the time period alleged in the complaint. The plaintiff does not allege any prior history or altercation with Dr. Weinstock. Most of the items the plaintiff's claims to require for a medical need appear to be

7

items of comfort. For example, the plaintiff's request for a back brace and double mattresses relate to complaints of back pain. The plaintiff has presented medical records reflecting moderate degenerative changes in his thoracic spine (Docket No. 77-2 at page 21) and mild disc space narrowing at L2-L3 and L4-L5. (Docket No. 77-2 at page 23). Dr. Weinstock has stated that, in his medical opinion, Tafari has no medical conditions warranting the back brace or double mattresses. The plaintiff has not raised a question of fact in this regard, but instead asserts that if "the plaintiff is not provided double mattresses and a back brace for day hours, he could become paralysis (sic) and never walk again." (Docket No. 71 at ¶ 6). This self-serving declaration by the plaintiff is unsubstantiated in the record. Dr. Weinstock states that it is his medical opinion that the thumb braces requested by the plaintiff – which relates to a thumb injury in 2003– are not medically needed, and in his judgement "could even be deleterious by leading to disuse atrophy." (Docket No. 59 at ¶16 ). The records cited by the plaintiff reflect that he injured his thumb in 2003. At that time he was given a soft splint to use while sleeping and a hard splint to use during the day. The splints were issued for a period of time "until therapist advises differently." (Docket No. 77-2 at page 34). An ex-ray taken in 2009 reflected no fracture or intrinsic bony abnormality, but a "small bony exostosis." (Docket No. 77-2 at page 41). Without any supporting medical evidence, the plaintiff contends that if he is not allowed to keep wearing the day and night thumb braces, the bony exostosis "may grow bigger and cause the thumb to be amputated." (Docket No. 71 at page 3). There is no indication that the splints ordered in 2004 or before were required to be continued due to the bony exostosis. Tafari also asserts that he requires Flexeril for back pain and tramodol for shoulder and thumb pain. Although Tafari had been prescribed Flexeril and tramadol for pain prior to his arrival at Five

8

Points, Dr. Weinstock determined that these medications were no longer appropriate. According to Dr. Weinstock, Flexeril (cyclobenzaprine) is a muscle relaxant approved by the Food and Drug Administration for use up to 3 weeks at a time. Further, after examining Tafari "on many occasions," Dr. Weinstock determined that "at no time did he evidence significant pain requiring narcotic type medication such as tramodol." (Docket No. 59 at ¶ 20). The plaintiff acknowledges in the Complaint that Dr. Weinstock advised him that he would treat the plaintiff's pain with other medication (Docket No. 1 at ¶ 26). The medical records reflect that on May 26, 2006, Tafari was provided with a prescription for pain medication (Docket No. 59 at page 22). Although the plaintiff may not agree with Dr. Weinstock's treatment, the plaintiff has presented no evidence that Dr. Weinstock was deliberately indifferent to his complaints of pain.

Similarly, the medical records reflect that in 1998, almost 8 years prior to Tafari's arrival at Five Points, he suffered from Bowenoid Papulosis, a skin condition affecting his groin area. for this condition, the plaintiff sought to have daily showers with a particular brand of soap and shampoo, a jock strap, cotton mattresses and vitamins.[3] Dr. Weinstock examined the plaintiff and found that there was no recurrence of the premalignant lesions. Dr. Weinstock referred Tafari to a dermatologist, Dr. Zaneder Miranda, who confirmed that the condition had not recurred. Notwithstanding, Dr. Miranda recommended the vitamins, showers with specific soap and shampoo, jock strap and cotton mattresses requested by Tafari. (Docket No. 1, Exhibit E1 at page 31). Dr. Weinstock declined to provide the recommended items, stating:

> It was (and is) my opinion that these recommendations bear no

---

[3] To the extent the plaintiff alleged that the defendants failed to provide him with a jock strap and cotton mattresses, it appears that the plaintiff acknowledges that he has been provided with these items. (Docket No. 71 at page 5).

> relationship to Bowenoid papulosis. The absence of the condition
> after several years is proof of its successful treatment and
> eradication. Dr. Miranda had confirmed my conclusion that the
> condition was cleared. Postinflammatory hypopigmentation is
> simply a benign scarring manifested by loss of skin pigment and
> requires no intervention. I did not find any of Dr. Miranda's
> recommendations to be necessary treatments related to, or flowing
> from, the findings on his examination or his diagnostic
> conclusions. None of these recommendations would have any
> influence upon the development of Bowenoid papulosis (warty
> growths caused by viral infection with the human papillomavius –
> HPV).

(Docket No. 59 at ¶12). Again, the plaintiff does not present any medical evidence to create a question of fact as to the opinion of Dr. Weinstock in this regard, but instead, states in conclusory form that if he is not provided with the amenities he seeks "he may catch full blown cancer." (Docket No. 71 at ¶9). The plaintiff has not established that there is any connection between the items he seeks and the likelihood of a recurrence of the skin condition or that the condition would develop into a malignant cancer. The plaintiff was provided with anti-dandruff medicated shampoo as a "comfort measure" because of his extremely long hair. (Docket No. 59 at ¶13). Dr. Weinstock's failure to provide the plaintiff with vitamins or the brand of soap and shampoo desired by the plaintiff does not constitute deliberate indifference to a serious medical need.

The plaintiff also argues that Dr. Weinstock was indifferent to his medical needs because he would not issue a permit for the plaintiff to wear Goretex boots and thermal underwear. The plaintiff claims that he has Raynaud's disease which causes his feet to "remain cold all year round." (Docket No. 71 at page 2). In support of this argument, Tafari cites to Exhibits E1 and E2 contained in Docket No. 77-2. Exhibit E1 is a form signed by Dr. J. Alves which states only that there is "a medical reason" for the plaintiff to wear boots, but does not diagnose Tafari as

suffering from Raynaud's disease. (Docket No. 77-2 at page 43). Similarly, Exhibit E2 is a consultation note from a medical provider[4] who examined Tafari due to complaints of a thickened nail on his right great toe. The report states: "please allow [patient] to wear his boots only to keep feet warm," but does not diagnose the plaintiff as suffering from Raynaud's disease. Dr. Weinstock asserts that Goretex is a water impenetrable material, and that there was no medical indication requiring boots with Goretex or thermal underwear. Tafari has not cited to medical documentation establishing that he suffers from Raynaud's disease or that the condition he suffers from could result in further significant injury or the unnecessary and wanton infliction of pain. Chance, 143 F.3d at 702. Tafari makes only the unsubstantiated conclusion that "if [the plaintiff] is not provided with Goretex boots, thermals (top, bottoms and socks) with insulated sneakers he can catch walking pneumonia that can cause him death." (Docket No. 71 at page 3). Again, in this regard the plaintiff has not demonstrated that he suffers from a serious medical condition which requires these amenities as treatment.

Tafari claims that Dr. Weinstock violated his rights by failing to direct that the plaintiff receive a vegetarian diet due to a purported allergy to "red meat, fowl and fish." (Docket No. 1 at ¶ 14). The plaintiff alleges that as a result of this denial he began to experience constipation, vomiting and stomach pain. (Docket No. 77 at ¶ 18). The plaintiff has not pointed to any medical document in the record reflecting a clinical basis for his assertion that he suffers from food allergies. The plaintiff cites to a 1989 Therapeutic Diet Order Form which states "vegetarian diet" but makes no diagnosis or clinical findings. (Docket No. 77-2 at page 3). Similarly, a 1994

---

[4] The signature on the report is illegible. The report reflects that the provider was Robert Ciepiela and that the report was reviewed by Dr. John Bauers. (Docket No. 77-2 at page 44).

11

Therapeutic Diet Order Form reflects a checked box under the heading "Allergy" and states "all meats, fowl and fish." (Docket No. 77-2 at page 4). The signatures on the 1989 and 1994 Therapeutic Diet Order Forms are illegible. These documents do not reflect any clinical findings in support of the plaintiff's contention that he has food allergies. The documents submitted as Exhibit J by the plaintiff reflect that there is no clinical evidence in support of the plaintiff's claim that he suffers from food allergies. Indeed, an entry in Tafari's ambulatory health record dated September 3, 1997 reflects that there is "no medical documentation of red meat allergy found on chart." (See September 3, 1997 Ambulatory Health Record included in Docket No. 78, page unnumbered). The only allergy listed by the plaintiff on a November 3, 1983 admission form was for an allergy to penicillin. (November 3, 1983 form included in Docket No. 78, page unnumbered). The records reflect that Tafari refused to be placed on a lactose restricted diet on a number of occasions (see May 27, 1999 Refusal of Medical Examination and/or Treatment Form prepared while the plaintiff was incarcerated at the Southport Correctional Facility; see also January 12, 1998 Ambulatory Health Record prepared while the plaintiff was incarcerated at the Southport Correctional Facility). Records reflect that in 1997 the plaintiff requested a special diet claiming that he did not eat meat or fish for religious reasons, but these records do not reflect that the plaintiff asserted that he had food allergies at that time. (see April 9, 1991 and September 3, 1997 Ambulatory Health Records included in Docket No. 78, page unnumbered). An entry in Tafari's Ambulatory Health Record dated December 28, 1995 reflects that diet change was not "medically indicated." (See December 28, 1995 Ambulatory Health Records included in Docket No. 78, page unnumbered). Similarly, on November 4, 1997, an entry in the plaintiff's medical records reflects that there was "no need for meatless diet seen." (See November 4, 1997

Ambulatory Health Record included in Docket No. 78, page unnumbered). The records submitted by the plaintiff also reflect that Tafari initially refused to be tested for food allergies (see January 15, 1998 Ambulatory Health Record included in Docket No. 78, page unnumbered; also February 23, 2001 entry included in Docket No. 78, page unnumbered). However, the records reflect that testing was performed and, according to medical notes dated March 8, 2005, any reference to food allergies was removed from Tafari's medical chart because allergy testing was negative. (March 8, 2005 Ambulatory Health Record included in Docket No. 78, page unnumbered). Finally, the Court notes that the plaintiff had previously commenced a lawsuit in which the plaintiff asserted that his constitutional rights were violated by the denial of his request to be transferred to the Green Haven Correctional Facility to participate in the Kosher Food Program which offered a hot Kosher meal alternative instead of the Kosher Cold Alternative Diet ("CAD") he had been receiving.[5] See Tafari v. Annets, 2008 WL 2413995 (S.D.N.Y. 2008)(Peck, A., M.J.).[6] The plaintiff claimed that he was entitled to participate in the special diet program based upon his religion (thus, implicating his First Amendment rights, not the Eighth Amendment issue raised in the instant case), but did not appear to assert that he suffered from any food allergy to meat, fish or fowl. In granting summary judgment in favor of the defendants in that case, the Court noted that the Kosher Cold Alternative Diet ("CAD") which the plaintiff was receiving in 2006 – the time period at issue in the instant case – was ***not*** a vegetarian diet.

---

[5] Tafari had been denied transfer to Green Haven, at least in part, due to the fact that the pilot program at Green Haven was only eligible to inmates with at least one year free of disciplinary convictions. Tafari v. Annets, 2008 WL 2413995 at *2.

[6] The plaintiff also complained that he was served non-kosher meals on isolated occasions while in transit. Tafari v. Annets, 2008 WL 2413995 at *1.

Tafari v. Annets, 2008 WL 2413995 at *1. Further, and just as significant, is the fact that the Green Haven's Kosher Food Program which Tafari expressly sought to participate in ***did not*** offer a vegetarian alternative to meat entrees. Tafari v. Annets, 2008 WL 2413995 at *2. Thus, contrary to the claims in this case, the plaintiff not only requested, but initiated litigation, to participate in a diet program that does not offer the vegetarian alternative meals that he claims are medically necessary for his health.

"The denial of a medically proscribed diet may constitute an Eighth Amendment violation under certain circumstances." Abdush-Shahid v. Coughlin, 933 F.Supp. 168, 180 (N.D.N.Y.1996); Robles v. Coughlin, 725 F.2d 12, 15-16 (2d Cir.1983) ("under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."); Chapdelaine v. Keller, 1998 WL 357350, at *12 (N.D.N.Y. Apr.16, 1998)("[T]he Eighth Amendment requires that prisoners receive nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it"). Moreover, to establish a valid claim that the denial of food (or the denial of a medically proscribed diet) constitutes an Eighth Amendment violation, one must establish that there was a "sufficiently serious condition" that resulted from the food not being received. Labounty, 1998 WL 214774, at *2. A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted); Bost v. Bockelmann, 2007 WL 527320, at *8 (N.D.N.Y. Feb.20, 2007)(concluding that, although Plaintiff allegedly lost fifteen pounds in two days, "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's food intake and weight loss concerns

represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation").

In the instant case, the record does not reflect evidence of clinical findings from which a trier of fact could conclude that the plaintiff suffers from any food allergy. Moreover, the record reflects that the plaintiff's complaints of constipation, vomiting and stomach pain have been treated with laxatives, stool softeners and other measures. (Docket No. 77-2 at page 8). The plaintiff has not presented evidence in the record from which a reasonable fact finder could conclude that the symptoms alleged by the plaintiff represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation on the part of Dr. Weinstock.

Lastly, the plaintiff asserts that the defendants "delayed one full year " surgery to repair a broken screw in the plaintiff's left shoulder. (Docket No. 1 at ¶ 18). The record reflects that Tafari had been scheduled to have elective surgery performed on his left shoulder on May 25, 2006, prior to his transfer to Five Points. It appears that on April 24, 2006, the plaintiff became aggressive and attempted to assault a nurse; on May 10, 2006, Tafari attempted to assault an officer; on May 11, 2006, Tafari assaulted the officer and threatened to commit suicide. Based upon these psychiatric issues, the plaintiff's surgery was postponed until his mental condition stabilized. (Docket No. 59 at page 23). Dr. Weinstock examined Tafari on May 26, 2006, one day after the surgery was to take place. Dr. Weinstock noted that the plaintiff would need psychiatric clearance before obtaining an orthopedic consult to reschedule the surgery. (Docket No. 59 at page 22). On July 26, 2006, Tafari was cleared psychologically for the surgery, and on July 28, 2006, Dr. Weinstock referred the plaintiff to a Dr. Zelko, an orthopedic surgeon, for

15

consultation. (Docket No. 59 at page 43). Dr. Zelko examined Tafarin on September 11, 2006 and determined that Dr. Jonathan L. Holder should perform the surgery. Dr. Holder was not a regular provider of consultative services to Five Points and was located 260 miles away necessitating special arrangements to be made for the plaintiff to be seen by Dr. Holder. Prior to those arrangements being made, commencing on or about October 16, 2006, Tafari engaged in a hunger strike (Docket No. 59 at page 40). Dr. Weinstock determined that the plaintiff could not be medically cleared for surgery in light of this nutritional deprivation. Upon examination on November 6, 2006, Dr. Weinstock noted that the plaintiff was responding slowly to questions and did not appear to know the date, or month. (Docket No. 59 at page 29). On November 13, 2006, officers found Tafari tying pieces of his sheet (which were tied to a hand rail by the sink) around his neck; faint redness was visible on both sides of his neck. (Docket No. 59 at page 24). Dr. Weinstock determined that the plaintiff was still unfit for elective surgery. (Docket No. 59 at page 5). The surgery was eventually performed by Dr. Holder on May 14, 2007. (Docket No. 59 at page 6). Based upon this uncontroverted record, the plaintiff has articulated no basis upon which a rational trier of fact could conclude that Dr. Weinstock's actions relating to the plaintiff's shoulder surgery could constitute deliberate indifference to the plaintiff's serious medical needs.

       The plaintiff has failed to raise an issue of fact precluding the grant of summary judgment as to Dr. Weinstock.

**The Remaining Defendants**

Defendants Trabout, French, Yost and Jastrzab are also entitled to summary judgment. . It is equally well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). Plaintiff must allege a "tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against prison officials. Monell v. Dep't of Social Serv. of New York, 436 U.S. 658, 692 (1978); Bass, 790 F.2d at 263. It is well settled that personal involvement is a prerequisite to an award of damages based upon a claim brought under §1983.

It is undisputed that Jastrzab, French and Yost are not part of the medical staff at Five Points and did not provide any medical treatment to the plaintiff or make any decisions relating to the medical care provided to the plaintiff. It is also undisputed that Dr. Trabout did not provide medical treatment to Tafari. The plaintiff's claim against Dr. Trabout is that he wrote to her to complain about the treatment provided by Dr. Weinstock. Inasmuch as the Court has determined that the treatment provided to the plaintiff by Dr. Weinstock was not deliberately indifferent to the plaintiff's medical needs, Tafari's attempt to place derivative responsibility upon Dr. Trabout must also fail. In any event, inasmuch as none of these defendants were personally involved in the treatment provided to the plaintiff, each is entitled to summary judgment.

**Plaintiff's Motion for Injunctive Relief**

To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor. Lusk v. Village of Cold Spring, 2007 WL 259873, *4 (2d. Cir. 2007) citing Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 348-49 (2d Cir.2003). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n. 12 (1987). A preliminary injunction is an extraordinary remedy which should not be granted lightly. Hanson Trust PLC v. MLSCM Acquisition, Inc., 781 F.2d 264, 273 (2d Cir. 1986) (a preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies). A party moving for a preliminary injunction has the burden of demonstrating that he or she will suffer irreparable harm if a preliminary injunction is not granted. Int'l. Brotherhood of Teamsters v. Local Union No. 10, 19 F.3d 786 (2d Cir. 1994). To demonstrate irreparable harm, a plaintiff must show that an injury is not remote or speculative, but actual and imminent, and that monetary damages will not suffice as a remedy. Forest City Daly Housing, Inc. v. Town of N. Hempstead, 175 F.3d 144, 153 (2d Cir. 1999).

In light of the above grant of summary judgment, the plaintiff's motion for injunctive relief is moot. The Court notes that the plaintiff no longer resides in Five Points, thus, the plaintiff's request for injunctive relief is moot on that basis as well.

**Motion for Reconsideration**

The plaintiff has filed a motion (Docket No. 73) to reconsider the denial of his motion to preclude (Docket No. 69) the filing of the defendant's motion for summary judgment. The premise of the plaintiff's motion was that the defendant's motion (Docket No. 57) was untimely filed. However, on December 7, 2009, the Court had extended the defendants" time to file dispositive motions to December 30, 2009 (Docket No. 54); and the defendants filed the dispositive motions on December 18, 2009. (Docket No. 57). Thus, the motions were timely filed. The plaintiff's motion to preclude was properly denied.

The plaintiff now seeks reconsideration of his motion to preclude citing to the original scheduling order in this case which had set an earlier deadline for the filing of dispositive motions. (Docket No. 16). This motion is frivolous. The plaintiff has filed numerous lawsuits in this and other Courts and is very experienced in pretrial proceedings. The plaintiff is certainly aware that a subsequent Order granting an extension of time for a pretrial filing would replace the earlier deadlines for those filings. The motion for reconsideration is denied.[7]

---

[7] The record in this case, and other cases involving Tafari, reflects a history on the part of the plaintiff to file multiple, often frivolous, motions for reconsideration. In the instant case, the initial Order of Hon. Charles J. Siragusa granted *in forma pauperis* status only as to the plaintiff's medical treatment claims and dismissed other claims asserted in the complaint. (Docket No. 5). The plaintiff filed a motion for reconsideration (Docket No. 6) which was denied (Docket No. 7). The plaintiff then again sought reconsideration (Docket No. 10) which was, again, denied by Judge Siragusa (Docket No. 11). In that Order, Judge Siragusa stated that the Court would not entertain further motions to reconsider the September 23, 2008 Order. (Docket No. 11). Notwithstanding, the plaintiff has filed another motion seeking reconsideration of that Order (Docket No. 37). Similarly, in another case before this Court, Tafari v. Stein, Civ. No. 01-841, the plaintiff filed two motions for reconsideration of the grant of summary judgment, both of which were denied. The plaintiff filed yet a third motion for reconsideration of the grant of summary judgment *after* the Second Circuit Court of Appeals had dismissed the plaintiff's appeal in that case. See Tafari v. Stein, Civ. No. 01CV841, Docket Nos. 80, 139, 141 and 165). These multiple, baseless motions for reconsideration serve no purpose but to delay the proper

**Conclusion**

Based on the above, the defendants' motion for summary judgment (Docket No. 57) is granted and the complaint is dismissed in its entirety. The motion for injunctive relief (Docket No. 45) and motion for reconsideration (Docket No. 73) are denied.

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
August 27, 2010

---

resolution of these cases. These filings are vexatious in nature, causing the defendants to perform unnecessary work and burdening the Court's motion calendar. The Clerk of the Court is directed not to accept for filing any further motion for reconsideration filed by the plaintiff in this case.